IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DARRELL B. HOUSE,

      Plaintiff,

      v.                                            Civ. No. 22-970 SCY/KK

NATIONAL PARK SERVICE, a political
subdivision of the Federal government; CITY OF
ALBUQUERQUE, a political subdivision of the
State of New Mexico; DEB HAALAND, in her
official capacity only as U.S. Secretary of Interior;
U.S DEPARTMENT OF THE INTERIOR;
National Park Service Director, CHARLES
"CHUCK" SAMS III, in his official and individual
capacity; Former Deputy Director of National Park
Service, SHAWN BENGE, in his official and
individual capacity; Former Counselor to the
Secretary of the Interior, MARGARET EVERSON,
in her official and individual capacity; Supervisory
Park Ranger, SUSANA VILLANUEVA, in her
official and individual capacity; Officer GRADEN,
officially and in his individual capacity; Officer
WINELAND, officially and in his individual
capacity; Officer I-X, officially and in his individual
capacity,

      Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

      Plaintiff Darrell B. House visited Petroglyph National Monument, located on ancestral

Tiwa and Pueblo lands, on December 27, 2020. According to the complaint, Plaintiff stepped off

trail to practice safe physical distancing during the COVID-19 pandemic. A National Park

Service ("NPS") officer, Defendant Graden, ordered him back on trail. When Plaintiff complied

and returned to the trail, Graden demanded identification. Plaintiff refused and started calling for

help from other hikers. Graden then tasered Plaintiff while Plaintiff held his arms up and

repeated that he was unarmed. Defendant Officer Wineland arrived on scene and held Plaintiff

down while Graden tasered Plaintiff.

Plaintiff brings suit against NPS, the U.S. Department of the Interior, the City of Albuquerque, NPS Officers Graden and Wineland in their official and individual capacities, and federal employees Deb Haaland, Charles Sams III, Shawn Benge, Margaret Everson and Susana Villanueva in their official capacities.[1] *See* Doc. 1, Complaint ("Compl."). Plaintiff claims violations of the Fourth Amendment; the Religious Freedom Restoration Act ("RFRA"); and the Administrative Procedures Act ("APA").

Defendants NPS, USDOI, Deb Haaland, Charles "Chuck" Sams III, Shawn Benge, Margaret Everson, Susana Villanueva, Matt Graden, and Matthew Wineland ("the federal government") move to dismiss the official-capacity claims against them. Doc. 58.[2] Separately, Defendant NPS Officers Graden and Wineland move to dismiss the individual-capacity claims against them. Doc. 59. The City of Albuquerque filed an answer rather than a motion to dismiss, but indicated it does not oppose the motions to dismiss. Docs. 29, 62 & 63. Plaintiff opposes the motions in their entirety.

The Court denies the motions to dismiss Plaintiff's claim for injunctive or declaratory

---

[1] The complaint originally asserted claims against Defendants Charles Sams III, Shawn Benge, Margaret Everson, and Susana Villanueva in their individual capacities, but those claims were dismissed by consent motion and stipulated order. Docs. 52 & 54.

[2] No party has asked the Court to dismiss the official-capacity claims against the named officers on the grounds that such official-capacity claims are duplicative of the suit against the government. *E.g.*, *Buck v. City of Albuquerque*, No. 04cv1000, 2006 WL 8443817, at *2 (D.N.M. Aug. 8, 2006) (where "a plaintiff chooses to sue both the municipality and the municipal officials in their official capacities, courts routinely dismiss the official capacity claims as redundant"); *Couser v. Gay*, 959 F.3d 1018, 1023 (10th Cir. 2020) (an official-capacity suit against an individual "'imposes liability on the entity that he represents'") (quoting *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). Nonetheless, because official-capacity claims against the individual defendants should be treated as claims against the entity, in the present Memorandum Opinion the Court treats this group of official-capacity claims as a suit against one entity—the federal government. *Sawyers v. Norton*, 962 F.3d 1270, 1278 n.4 (10th Cir. 2020).

relief under RFRA. The motions to dismiss are granted in all other respects.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint for failure to state a claim upon which the court can grant relief. "[T]o withstand a Rule 12(b)(6) motion to dismiss, a complaint must contain enough allegations of fact, taken as true, to state a claim to relief that is plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a complaint does not require detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

"A claim is facially plausible when the allegations give rise to a reasonable inference that the defendant is liable." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016). The court's consideration, therefore, is limited to determining whether the complaint states a legally sufficient claim upon which the court can grant relief. *See Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999). The court is not required to accept conclusions of law or the asserted application of law to the alleged facts. *See Hackford v. Babbitt*, 14 F.3d 1457, 1465 (10th Cir. 1994). Nor is the court required to accept as true legal conclusions that are masquerading as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must, however, view a plaintiff's allegations in the light most favorable to the plaintiff. *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013).[3]

---

[3] The government devotes a subsection in its motion to outlining the legal standard for a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction. Doc. 58 at 4-5. In response, Plaintiff presents argument in support of subject-matter jurisdiction as it relates to the complaint as a whole. Doc. 67 at 3-4. The Court, however, does not read the government's motion as

**DISCUSSION**

I.      **Count I – Excessive Force**

Count I brings a claim for violation of the Fourth Amendment right to be free of excessive force against Defendant NPS Officers Graden and Wineland pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Graden and Wineland move to dismiss the *Bivens* claims Plaintiff has brought against them in their individual capacities.[4] First, they argue that the Court should not imply a remedy under *Bivens* for these claims. Second, they argue qualified immunity shields them from suit. Because the Court agrees that binding precedent forecloses the *Bivens* claims Plaintiff brings against them, the Court does not reach the question of qualified immunity.

No statutory remedy exists against federal officials for violation of individual federal constitutional rights. In *Bivens*, however, the Supreme Court created, under federal common law, an implied damages action against federal officials who allegedly violated the plaintiff's constitutional rights. The plaintiff in *Bivens* alleged that agents of the Federal Bureau of Narcotics illegally entered the plaintiff's home, manacled the plaintiff, and threatened his family while arresting him for narcotics violations. Since recognizing this implied cause of action for a

---

challenging subject-matter jurisdiction regarding the complaint as a whole. Instead, the Court reads the government's motion as providing a discussion of subject-matter jurisdiction as a backdrop to its arguments that may implicate subject-matter jurisdiction consideration, such as its argument that it enjoys sovereign immunity. *E.g.*, Doc. 58 at 6-7. The Court addresses jurisdictional arguments the parties raise related to each of Plaintiff's causes of action separately, when discussing those causes of action below.

[4] The parties agree that sovereign immunity bars claims for a direct violation of the Fourth Amendment against officers in their official capacities. Doc. 58 at 6-8; Doc. 67 at 7 ("Plaintiff will concede that the *Bivens* official capacity claims against Officer Defendants are frustrated by sovereign immunity and should be dismissed . . . ."). For this reason, to the extent the complaint brings official-capacity claims in Count I, they are dismissed.

constitutional violation in 1971, the Court has only recognized it twice more: first, implying a remedy for a former congressional staffer's Fifth Amendment sex-discrimination claim in *Davis v. Passman*, 442 U.S. 228 (1979); and second, recognizing a federal prisoner's Eighth Amendment inadequate-medical-care claim in *Carlson v. Green*, 446 U.S. 14 (1980).

After *Green*, the Court narrowed, rather than expanded, the scope of *Bivens*' implied cause of action. In one of the Court's more recent statements on *Bivens*, the Court declared that "[r]ecognizing a cause of action under *Bivens* is a disfavored judicial activity." *Egbert v. Boule*, 596 U.S. 482, 491 (2022) (internal quotation marks omitted). The Court further expressed its disinclination to expand the scope of *Bivens*, commenting that "in all but the most unusual circumstances, prescribing a cause of action is a job for Congress." *Id.* at 486. Although the Court did not explain what "unusual circumstances" would justify expanding the already-recognized scope of *Bivens*, Supreme Court jurisprudence over the last forty years makes clear that the case at bar does not present unusual circumstances that could justify recognition of a *Bivens*-like implied cause of action. Instead, the present case closely conforms to situations in which the Supreme Court has instructed courts not to imply a cause of action.

The Supreme Court has explained:

> To inform a court's analysis of a proposed *Bivens* claim, our cases have framed the inquiry as proceeding in two steps. First, we ask whether the case presents a new *Bivens* context—i.e., is it meaningfully different from the three cases in which the Court has implied a damages action. Second, if a claim arises in a new context, a *Bivens* remedy is unavailable if there are "special factors" indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed. If there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy.

*Id.* at 492 (cleaned up).

The Tenth Circuit has held that expanding *Bivens* actions against "officers from a different agency" other than the three already recognized presents a "new category of

defendants" and therefore a new context. *Logsdon v. United States Marshal Serv.*, 91 F.4th 1352, 1358 (10th Cir. 2024). Because the Supreme Court has never authorized a *Bivens* action against NPS officials engaged in enforcement of NPS regulations, this case presents a new context. *See also id.* at 1355 ("The [Supreme] Court has said in effect that almost any difference between the case at hand and the three Court precedents can justify rejecting a cause of action."). Indeed, Plaintiff acknowledges that "most claims will raise a 'new context'" and implicitly concedes or assumes that his case presents a new context by arguing that he can state a claim "[d]espite a new context." Doc. 68 at 5.

Thus, the parties agree that the Court's analysis must proceed to the second step. At this step, Plaintiff argues, this case presents a straightforward excessive force claim under settled constitutional law principles based on the tasering of a nonviolent, unresisting victim and there are no factors counseling hesitation in extending *Bivens*. Doc. 68 at 5-6. Even assuming Plaintiff is correct that the allegations here present a clear and straightforward case of excessive force, however, Supreme Court and Tenth Circuit precedent foreclose Plaintiff's claim. Under binding precedent from these courts, factors exist that counsel hesitation in extending *Bivens* to the present case.

Start with the Supreme Court. Like the present case, *Egbert v. Boule* dealt with allegations of a straightforward case of excessive force used against a nonviolent and unresisting victim. In *Egbert*, a border patrol agent was investigating suspected immigration violations at Robert Boule's bed and breakfast located near the border between the United States and Canada. 596 U.S. 482. Agent Erik Egbert entered the property and Boule instructed him to leave. *Id.* at 489. The plaintiff further alleged that Agent Egbert declined, lifted Boule off the ground, threw him against the agent's SUV, and then threw him to the ground. *Id.* at 489-90. Before the case

came to the Supreme Court, the Ninth Circuit ruled consistently with the argument Plaintiff here makes. It found that Boule pleaded a "conventional Fourth Amendment excessive force claim arising out of actions by a rank-and-file border patrol agent on Boule's own property in the United States," and no special factors weighed against implying a *Bivens* remedy. *Boule v. Egbert*, 998 F.3d 370, 387 (9th Cir. 2021).

But the Supreme Court disagreed and reversed. First, and unrelated to the present case, the Supreme Court found it significant that the arrest in *Egbert* occurred in proximity to a United States border and that Congress is better suited to imply a remedy in cases that arise near an international border. 596 U.S. at 495-97. The Court's second reason for declining to recognize an implied cause of action, however, does relate to the present case. The Court determined, "Congress has provided alternative remedies for aggrieved parties in Boule's position that independently foreclose a *Bivens* action here." *Id.* at 497. The remedies were twofold: first, the Executive Branch had already investigated the alleged misconduct; and second, the alleged victim could file grievances with the agency through an administrative redress process. *Id.* The Court rejected the argument that the "grievance process is inadequate because [the plaintiff] is not entitled to participate and has no right to judicial review of an adverse determination." *Id.* "[W]e have never held that a *Bivens* alternative must afford rights to participation or appeal." *Id.* at 497-98. The Court explained:

> *Bivens* is concerned solely with deterring the unconstitutional acts of individual officers—i.e., the focus is whether the Government has put in place safeguards to prevent constitutional violations from recurring. And, again, the question whether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts. So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy. That is true even if a court independently concludes that the Government's procedures are not as effective as an individual damages remedy.

*Id.* at 498 (cleaned up).

The Court also made clear that the existence of these alternate remedies was alone a sufficient factor to decline to imply a *Bivens* remedy (even in the absence of the cross-border context that existed in *Egbert*). The Court directed, "If there are alternative remedial structures in place, that alone, like any special factor, is reason enough to limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.* at 493. The Tenth Circuit has echoed this finding in a published opinion. *Silva v. United States*, 45 F.4th 1134, 1141 (10th Cir. 2022) ("Because the Supreme Court has recognized independent means of disposing of *Bivens* claims, we focus our analysis on the alternative remedial schemes available to Plaintiff.").

Confronted with the daunting uphill climb recent *Bivens* jurisprudence presents, Plaintiff pushes back, arguing that "it is insufficient to merely allege that alternative remedies exist" and that the officers must affirmatively demonstrate the remedies are sufficient. Doc. 68 at 7-8. Fatal to Plaintiff's argument, however, is that Graden and Wineland identify the same remedies the Supreme Court (in *Egbert*) and the Tenth Circuit (in *Silva*) have found sufficient to foreclose a *Bivens* claim.

First, the NPS engaged in an administrative review process concerning the constitutionality of the officers' actions. Indeed, Plaintiff's own complaint makes it clear that the NPS Office of Professional Responsibility reviewed the officers' actions and assessed the reasonableness of their actions. Compl. ¶¶ 102, 113-20, 176. This would, on its own, be an independently sufficient reason to decline to fashion a *Bivens* remedy. *Egbert*, 596 U.S. at 497 (declining to authorize a *Bivens* remedy in part because the executive branch already had conducted a year-long internal investigation into Agent Egbert's conduct).

Second, Graden and Wineland explain that Congress and the agency created a procedure for the general public to report wrongdoing and mismanagement. Doc. 59 at 9. That is, Congress

created and authorized Inspectors General to investigate allegations of wrongdoing by federal

law enforcement officers. Inspector General Act of 1978, Pub. L. No. 95-452, 92 Stat. 1101.

And, in turn, the U.S. Department of Interior Office of Inspector General invites the public to

present allegations of misconduct against NPS employees. *See* Complaint Hotline, Office of

Inspector General, https://www.doioig.gov/complaints-requests/complaint-hotline. Tenth Circuit

precedent mandates that the Court conclude the complaint hotline "is an adequate 'means

through which allegedly unconstitutional actions can be brought to the attention of the [agency]

and prevented from recurring.'" *Silva*, 45 F.4th at 1141 (quoting *Corr. Servs. Corp. v. Malesko*,

534 U.S. 61, 74 (2001)) (alterations omitted). Further, the Tenth Circuit in *Silva* stressed,

"Because *Bivens* is concerned solely with deterring the unconstitutional acts of individual

officers, we find the availability of [an] Administrative Remedy Program offers an independently

sufficient ground to foreclose Plaintiff's *Bivens* claim." *Id.* (cleaned up); *see also Logsdon v.*

*United States Marshal Serv.*, 91 F.4th 1352, 1359 (10th Cir. 2024) ("the Department of Justice's

Office of the Inspector General (OIG) investigation procedure [is an] adequate alternative

remed[y]); *Egbert*, 596 U.S. at 497 (the Border Patrol is required to investigate alleged violations

of the standards for enforcement activities and accept grievances from anyone wishing to lodge a

complaint; the plaintiff took advantage of this grievance procedure).

Because Supreme Court and Tenth Circuit precedent foreclose the creation of a *Bivens*

remedy for damages against the individual NPS officer defendants, the Court grants Graden and

Wineland's motion to dismiss Count I.

## II.     Count II – *Monell* Claim

Count II asserts a claim of "Liability under *Monell* for Failure to Train" against

Defendants National Park Service, City of Albuquerque, and NPS Director Defendant Sams. The

federal government moves to dismiss this claim because *Monell* is merely a doctrine under which

a plaintiff may state a 42 U.S.C. § 1983 claim, and § 1983 claims lie against state actors, not federal actors. Doc. 58 at 8-10.

Plaintiff responds that these federal actors can be liable because they were acting pursuant to a Co-Management Agreement with the City of Albuquerque, and thus state law. Doc. 67 at 8-12. Plaintiff argues:

> [Cases] in different federal courts across the country, stand for the proposition that non-state, federal, or other private actors, can be liable for acting under color of law under Section 1983. *See, e.g.*, *West v. City of Mesa*, 128 F. Supp. 3d 1233, 1240 (D. Ariz. 2015), *aff'd*, 708 F. App'x 288 (9th Cir. 2017) (quoting *Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 783 (9th Cir. 2001) (individuals acting under color of federal law could be held liable under Section 1983 if "they acted jointly with state actors to deprive the plaintiffs of their constitutional rights"). It follows, then, that a *Monell* claim which extends from a Section 1983 claim to municipalities for constitutional violations, could be extended by the Court as well to non-state actors acting in concert or jointly, with state or local municipalities, as is the case here.

Doc. 67 at 9.

The Court agrees with Plaintiff that non-state actors can be held liable for acting in concert with state actors under certain circumstances. But Plaintiff cites case law demonstrating that those circumstances are strictly limited. *West*, 128 F. Supp. 3d at 1240 ("Individuals acting under color of federal law may be held liable under § 1983 *only if* 'they conspired or acted jointly with state actors to deprive the plaintiffs of their constitutional rights.'" (emphasis added) (quoting *Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 783 (9th Cir. 2001)); *see also Martin v. Stites*, 203 F. Supp. 2d 1237, 1253 (D. Kan. 2002) ("To prove a conspiracy between private parties and state actors to violate constitutional rights actionable under § 1983, Plaintiffs must show a joint participation, agreement, or meeting of the minds to violate such constitutional rights. They must establish both the deprivation of a constitutional right and the existence of a conspiracy." (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970); and *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 n.6 (10th Cir. 1990))).

Plaintiff's complaint includes no factual allegations supporting a contention that Defendant NPS or Director Sams acted jointly or in concert with a state actor to violate Plaintiff's constitutional rights. In fact, the only allegations in Count II pertaining to the federal actors is that "Defendants City of Albuquerque and Defendant National Park Service are parties to a co-management agreement governing the shared responsibility of creating and enforcing policies at Petroglyphs National Park" and "Defendant Sams is the Director of the National Park Service and is the federal government official responsible for making official policy on behalf of the management of Petroglyphs National Park." Compl. ¶¶ 144-45. The complaint does not allege that anything in the co-management agreement or NPS official policy constitutes a conspiracy or a meeting of the minds for the purpose of violating Plaintiff's civil rights. Plaintiff does not make any other arguments supporting section 1983 liability against federal actors. Absent plausible factual support for Plaintiff's theory of a meeting of the minds to violate civil rights, the federal government is correct that the complaint does not state a section 1983 conspiracy claim against non-state actors. Thus, the Court grants the federal government's motion to dismiss Count II.

## III.    Count III – RFRA

Count III of the complaint brings a Religious Freedom Restoration Act ("RFRA") claim against all defendants. The federal government moves to dismiss the official-capacity claims (Doc 58) and Graden and Wineland move for qualified immunity on the individual-capacity claims (Doc. 59).

RFRA provides that the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). A plaintiff makes a prima facie case under RFRA by showing the government action (1) substantially burdens (2) a sincere (3) religious exercise. *Gonzales v. O Centro Espirita*

*Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006). The burden then shifts to the government to demonstrate that the "application of the burden to the person" furthers a compelling government interest" and "is the least restrictive means" of doing so. *Id.* at 428-29; 42 U.S.C. § 2000bb-1(b).

The Court will address the federal government's motion to dismiss first. As a threshold matter, the federal government moves to dismiss the RFRA claim against it on the basis of sovereign immunity insofar as Plaintiff requests monetary damages. Doc. 58 at 11. Plaintiff clarifies that his complaint "requests 'equitable relief' and does not specify money damages." Doc. 67 at 14. The Court agrees that Plaintiff's clarification reflects the plain meaning of the relief requested in the complaint. Doc. 1 at 47.[5] Therefore, the Court need not reach the federal government's argument regarding whether money damages are available under RFRA against it.

The Court thus turns its focus to whether Plaintiff stated a claim for injunctive or declaratory relief against the federal government under RFRA. To begin, the Court must first clarify the nature of Plaintiff's RFRA challenge. The government assumes Plaintiff challenges the facially neutral prohibition against walking off trail at Petroglyph. It argues:

- "Plaintiff has not alleged . . . that the federal government's rule of general applicability—visitors to Petroglyph National Monument must stay on trail—substantially burdened his religious exercise." Doc. 58 at 13.

- "The Complaint lacks any allegation that NPS's standard prohibition on walking off trail imposes a substantial burden on the exercise of religion under the legal standard set by the Supreme Court." Doc. 58 at 15.

- "The Complaint contains no allegation that even begins to explain how and why a regulation requiring visitors to stay on trail affects in any way the exercise of religion at Petroglyph National Monument." Doc. 58 at 16.

---

[5] Although Plaintiff indicates that he is not seeking money damages under RFRA, he does assert that money damages are available under RFRA. Doc. 67 at 14. The Court does not reach this argument.

The crux of Plaintiff's argument, however, is not that the government's regulation about staying on trail burdens his exercise of religion.

Plaintiff does not allege in his complaint that his exercise of religion compelled him to go off trail, or that the regulation against going off trail burdened or in any way related to the exercise of his religion. Rather, as the government recognizes, the complaint states that Plaintiff only "stepped off trail to practice safe physical distancing during a pandemic, to put space between themselves and other hikers." Doc. 58 at 13 (quoting Doc. 1 at ¶ 80). The RFRA challenge Plaintiff makes relates not to the regulation to stay on trail but, instead, to the use of excessive force while he visited Petroglyph:

> 79. Mr. House traveled to Petroglyph to pray [and] honor the earth and his ancestors . . . .
>
> . . . .
>
> 161. [T]he violent treatment Mr. House experienced created a substantial burden on his ability to pray and connect with ancestral lands. Not only was Mr. House harangued for being off-trail, he was followed, lectured about Native Americans, asked for identification, and ultimately tased. Such actions instilled fear in Mr. House and created outrage and indignation from Indigenous people across the country who saw the events as a miscarriage of justice, a blatant disregard for federal laws and regulations governing Native American religious rights, and a fundamental lack of cultural understanding and training in cultural safety and meaningful access to sacred sites by Indigenous peoples.

Compl. ¶¶ 79, 161. In other words, Plaintiff's complaint asserts that the excessive force—*not* the facially neutral prohibition against walking off trail—substantially burdened his travel to Petroglyph to pray and honor the earth and his ancestors, i.e., a sincere religious exercise. The federal government does not offer any reason that this does not state a prima facie claim under RFRA and does not invoke the defense of a compelling government interest. Plaintiff's complaint thus states a RFRA claim.

Nor do any of the other various arguments the federal government makes defeat this claim. For instance, the federal government argues that "the Complaint does not contain allegations indicating that Plaintiff told Graden he was praying or otherwise engaged in religious exercise." Doc. 58 at 13. This may be true. But the federal government cites no case law indicating a claim for injunctive or declaratory relief under RFRA must include a mens rea component. And the government presents no argument as to how Graden's lack of knowledge regarding Plaintiff's religious purpose for being at Petroglyph precludes injunctive relief against the agency to protect future religious practice.

Next, the federal government argues that the complaint "does not contain allegations indicating that Plaintiff was in fact praying or otherwise engaged in religious exercise when he interacted with Officer Graden." Doc. 58 at 13. This argument reads Plaintiff's claim too narrowly. The complaint states that Plaintiff traveled to Petroglyph to pray and honor the earth and his ancestors, and that the use of excessive force substantially burdened this sincere religious exercise. The claim is not that Graden used excessive force *because of* Plaintiff's religion (i.e. tasered Plaintiff for actively praying) and such allegations do not appear to be necessary under RFRA. Plaintiff alleges what the statute forbids: the government action had the effect of substantially burdening his religious exercise.

Taking a different tack, the federal government also appears to argue the Court should dismiss Plaintiff's RFRA claim because it is too broad. It asserts, "the Complaint alleges that any application of the NPS regulation to any person who is Native American will substantially burden the exercise of religion 'because all land is considered sacred.'" Doc. 58 at 14 (quoting Doc. 1 ¶ 69) (alterations omitted). As above, this argument misapprehends Plaintiff's claim. Plaintiff is not seeking an injunction related to an NPS regulation. Instead, Plaintiff is seeking an

injunction related to excessive force used against a Native American that prevented him from exercising his religion (albeit, perhaps, not at the precise moment the excessive force was used) at a location Defendants do not dispute is sacred to certain Native Americans. Such a claim is not too broad under RFRA.

Further, the Court does not adjudicate whether all land is indeed sacred in Plaintiff's religion. Whether the specific foundations of Plaintiff's travel to Petroglyph constitute a reasonable religious exercise is not for the Court to examine. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014) ("the federal courts have no business addressing whether the religious belief asserted in a RFRA case is reasonable" (parentheses removed)). Nor would the fact that any adherent of Plaintiff's religion can bring such a claim be grounds to dismiss a RFRA claim, and the federal government offers no authority supporting such an argument.

Finally, the federal government argues that "Plaintiff also has not pled the second threshold requirement: a sincere exercise of religion or a religious belief as opposed to a philosophy or a way of life. Plaintiff does not allege that he practices a Native American religion." Doc. 58 at 15. This is simply incorrect. As quoted above, Plaintiff stated he "traveled to Petroglyph to pray [and] honor the earth and his ancestors." Compl. ¶ 79. The Complaint elsewhere elaborates on why this is a religious exercise, *in addition to* being a philosophy and a way of life:

> 64. Raised by his Navajo grandmother, Mr. House was taught at an early age to respect his traditions, ancestors, and to strive to live in harmony with the Creator and with nature.
>
> 65. Prayer on ancestral lands is an integral aspect of Navajo traditional religious practice and spiritual beliefs and is central to Mr. House's identity as an Indigenous person.
>
> 66. Diné traditional beliefs teach the importance of prayers that align with the earth and sky, reciting that their feet is our feet, their legs are our legs, their body

is our body, and their mind is our mind. Through these prayers, our physical, mental, and spiritual existences are renewed.

. . . .

69. Because all land is considered sacred, as part of his deeply-held, religious and spiritual beliefs, Mr. House has spent time praying on ancestral lands throughout the Southwest and honoring foreign lands when deployed overseas as a U.S. Marine.

. . . .

71. Mr. House believes deeply in the protection of the Earth and Water for future generations. As such, besides prayer at sacred sites, he has also visited and supported Indigenous-led nonviolent direct action prayer camps located on ancestral or unceded territories including Standing Rock in peaceful opposition to the Dakota Access Pipeline and recently, at Line 3 in Minnesota.

72. Petroglyph National Park is located on ancestral Pueblo lands but is also recognized as a sacred site under Navajo traditions and fundamental law.

73. Under Navajo traditions, Diné elders and medicine people have taught us to honor and respect the Great Spirit's creation by always acknowledging their presence with us. They have taught us to always honor their connections with prayers and songs wherever we go and our prayers to the four cardinal directions do not end at the artificial boundaries of our Reservation or States.

74. In addition, it is part of the Diné way of life to honor sacred sites through the proper protocol of respect and offerings for they are the foundation of Diné spiritual ceremonies.

75. Under Diné fundamental law, they are also taught to respect and honor sacred sites that are away from the Navajo Reservation. Petroglyph National Monument and Chaco Ruins are two examples of this, which are respected and honored as places of cultural remains of people before us and prayers are offered to seek protection from the spirits of indigenous people who are no longer with us.

. . . .

77. In addition, Diné have traveled several hundred miles from the Reservation to offer prayers. So as Dines, we are not confined to make our spiritual expression only to the Dine Reservation.

Compl. at 19-22 (internal quotation marks, alterations, and citations omitted). The Court finds

that Plaintiff has amply pled that his visit to Petroglyph was a sincere religious exercise.

The Court now turns to Plaintiff's RFRA claim against Graden and Wineland in their individual capacities. Doc. 1 at 40. The officers move to dismiss this claim, first arguing that the complaint fails to state a claim. Doc. 59 at 14 ("Plaintiff alleges he was tased, not for exercising his religion, but 'for being off trail at the Petroglyphs,' to 'practice safe physical distancing during a pandemic.' This concession alone entitles Graden and Wineland to qualified immunity.") (citations and footnote omitted). As above, this characterization of Plaintiff's claim fails to capture the crux of his argument. Plaintiff's focus does not appear to be on why Graden tasered him. Instead, his focus appears to be on the alleged use of excessive force in connection with a minor violation, and on the chilling effect such a proclivity to use excessive force had, and will have, on the exercise of his religion at Petroglyph. Because Plaintiff amply pled that his visit to Petroglyph was a sincere religious exercise and that the officers burdened that exercise through their use of excessive force, the Court rejects the officers' first argument.

Second, the officers invoke the defense of qualified immunity. Doc. 59 at 14-15. The Supreme Court has ruled that RFRA permits individual-capacity claims against individual officers for money damages. *Tanzin v. Tanvir*, 592 U.S. 43, 52 (2020). And the Tenth Circuit subsequently ruled that qualified immunity is a defense to individual-capacity claims for money damages under RFRA. *Ajaj v. Fed. Bureau of Prisons*, 25 F.4th 805, 813 (10th Cir. 2022). These decisions, however, do not address—either to approve or to rule out—the viability of individual-capacity claims for injunctive or declaratory relief. In their motion to dismiss, Graden and Wineland do not argue that individual-capacity claims for injunctive or declaratory relief are unavailable as a matter of statutory interpretation. Instead, they invoke the defense of qualified immunity. But the defense of qualified immunity is not available as a shield to claims for

injunctive or declaratory relief. *Jones v. City & Cnty. of Denver, Colo.*, 854 F.2d 1206, 1208 n.2 (10th Cir. 1988); *Kerns v. Bader*, 663 F.3d 1173, 1187 n.5 (10th Cir. 2011).

The Court declines to rule, in the absence of briefing on the topic, whether injunctive or declaratory relief is available under RFRA against officers sued in their individual capacities by a plaintiff requesting specific and individual relief from the officers. The Court confines its ruling to the narrow arguments the motion to dismiss raises and rejects those narrow arguments. The complaint states a RFRA claim for injunctive or declaratory relief. Qualified immunity is not available as a defense to a request for injunctive or declaratory relief. Therefore, the Court denies Graden and Wineland's motion to dismiss the RFRA claim on the basis of qualified immunity.

In sum, the Court denies the motions to dismiss the RFRA claims for injunctive and declaratory relief. The Court does, however, grant the motions to dismiss the claims for money damages in light of Plaintiff's clarification that he did not intend to bring any such claims.

## IV.     Count IV – APA

Both the federal government and the individual defendants Graden and Wineland move to dismiss Plaintiff's APA claim. The Court grants the officers' motion to dismiss the individual-capacity claims because "the APA does not provide for individual-capacity claims." *Jefferson v. Harris*, 170 F. Supp. 3d 194, 217 (D.D.C. 2016) (alterations omitted); *see* 5 U.S.C. § 702 (providing a cause of action to "[a] person suffering legal wrong because of *agency* action") (emphasis added); *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009) (the APA does not allow claims against individuals). Plaintiff does not argue otherwise, stating in response to Graden and Wineland's motion to dismiss that "the APA claim against all Federal Defendants and Officer Defendants must survive because Plaintiff is requesting declaratory relief under the APA, which is a limited purpose and limited waiver of sovereign immunity, as well as

any declaratory relief would be directly relevant to the conduct and actions of Officer Graden and Officer Wineland on the day of the incident." Doc. 68 at 15. Individuals, of course, do not have sovereign immunity and thus a waiver of sovereign immunity is irrelevant to individual-capacity claims. Because Plaintiff cites no authority or persuasive argument in support of his contention that APA claims may lie against individuals, the Court grants Graden and Wineland's motion to dismiss any individual-capacity claims Plaintiff brings in Count IV (Doc. 59).

As for the official-capacity claims, Plaintiff petitions for judicial review of "the NPS decision." The complaint identifies "the NPS decision" as follows:

> On March 12, 2021, (the "NPS Decision"), the NPS concluded its internal investigation and determined that Defendant Graden had acted in accordance with NPS policy during the incident with Mr. House on December 27, 2020, and cleared him of any wrongdoing.

> In addition, the NPS Decision announcement stated that "[i]n the months ahead, we will be working with the Pueblo and Tribal communities to develop ways to better coordinate use of the area for ceremonial and religious purposes."

Compl. ¶¶ 176-77.

The federal government argues that the NPS decision is not an "agency action" subject to judicial review. Doc. 58 at 19. "Whether federal conduct constitutes final agency action within the meaning of the APA is a legal question." *Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000). The APA defines "agency action" as an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). "Plaintiffs have the burden of identifying specific federal conduct and explaining how it is 'final agency action' within the meaning of section 551(13)." *Colo. Farm Bureau Fed'n*, 220 F.3d at 1173. "In order to determine if an agency action is final, we look to whether its impact is direct and immediate, whether the action marks the consummation of the agency's decision-making

process, and whether the action is one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 1173-74 (cleaned up).

With respect to the allegation in paragraph 177 of the complaint—the announcement that the agency "will be working with the Pueblo and Tribal communities"—this is not final agency action subject to judicial review. "[A] general agreement for state and federal agencies to work together in the future on specific projects . . . is not 'final agency action.'" *Colo. Farm Bureau Fed'n*, 220 F.3d at 1174. The Court therefore dismisses the APA claim with respect to this paragraph of the complaint.

The subject of paragraph 176—the determination that Graden acted in accordance with NPS policy—presents a different issue. In lay terms, it is a "decision"—a decision that Graden did not use inappropriate force. However, under the APA, it is not a final agency decision subject to judicial review. That is because it did not "determine" any "rights or obligations" and because there are no "legal consequences" that will flow to Plaintiff from it. *Cf. Colo. Farm Bureau Fed'n*, 220 F.3d at 1173-74. Instead, the NPS decision announces the results of its investigation.[6] Plaintiff's disagreement with the result of the agency investigation does not mean that the investigation altered his legal rights or obligations. The agency expressing an opinion with which Plaintiff disagrees does not constitute a legal consequence.

Plaintiff does not argue otherwise. Instead, Plaintiff argues that the NPS decision "denied Mr. House any relief through internal investigation"; and complains that it "did not alter the

---

[6] This conclusion is not incompatible with the earlier finding in this Memorandum Opinion that the availability of administrative relief is an alternate remedy foreclosing a *Bivens* claim. The administrative relief that forecloses a *Bivens* claim need not afford the plaintiff a right to participate, the right to appeal, or the right to judicial review. *Egbert*, 596 U.S. at 497-98 ("[W]e have never held that a *Bivens* alternative must afford rights to participation or appeal.").

regime by which the agency operates, [and that] it is precisely the lack of any change, the finding of no wrongdoing, and lack of policies surrounding Native Americans' access and religious practice in the monument, that Plaintiff asks this Court to review." Doc. 67 at 17. In other words, rather than an allegation that the NPS took final agency action that affected Plaintiff's legal rights, Plaintiff argues that the NPS failed to do something Plaintiff contends it should have done (sanction Graden and change its policies on Native American access to Petroglyphs).

An agency's failure to act is "sometimes remediable under the APA, but not always." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 61 (2004). To succeed in such a claim, the plaintiff must assert that an agency failed "to take a *discrete* agency action that it is *required to take*." *Id.* at 64. This provision of the APA "empowers a court only to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing how it shall act." *Id.* (internal quotation marks omitted). That is, the APA does not provide an avenue for the Court to review NPS's determination regarding Graden's use of force. Further, Plaintiff identifies no statutory duty requiring the NPS to afford him relief through its internal grievance process.

The Court therefore grants the motions to dismiss Count IV.

## V.      Request to Amend

In response to the federal government's motion to dismiss, Plaintiff states that: "should the Court determine there is a deficiency, Plaintiff moves this Court to grant him leave to amend his complaint within a reasonable time period." Doc. 67 at 17. The request fails to comply with Local Rule 7.1(a) ("Movant must determine whether a motion is opposed, and a motion that omits recitation of a good-faith request for concurrence may be summarily denied."), and Local Rule 15.1 ("A proposed amendment to a pleading must accompany the motion to amend."). The

request is denied without prejudice to a refiled motion that addresses the correct legal standards and complies with the Local Rules.

## CONCLUSION

The Court GRANTS IN PART and DENIES IN PART the federal government's Motion To Dismiss (Doc. 58) and Defendants Matthew Graden And Matthew Wineland Motion To Dismiss The Complaint (Doc. 59). The Court does not dismiss any claims against the City of Albuquerque, which has not moved to dismiss any claims.

THEREFORE, IT IS ORDERED THAT:

1.      Count I is DISMISSED in its entirety;

2.      Count II is DISMISSED insofar as it states claims against Defendants National Park Service and NPS Director Sams;

3.      Count III is not dismissed, but is interpreted as bringing claims for declaratory and injunctive relief and not money damages; and

4.      Count IV is DISMISSED as against all Defendants except the City of Albuquerque.

As a result, the only claims remaining are Count II (*Monell* claims) and Count IV (APA) against the City of Albuquerque, and Count III (RFRA) against all defendants.

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE